Bernard Ryan, P. J.
On or about February 9,1953 claimant corporation entered into a contract with the New York State Thruway Authority for the construction of a portion of the-Thruway, being Ontario Section, District 5, Subdivision 15, Ransom Road to Genesee County line in the County of Erie. The contract was designated by numbers ST 53-02, OT 53-1. One A. L. Dougherty, doing business as A. L. Dougherty Company, subcontracted the performance of certain items of the work and this suit arises from developments encountered in his operation.
*996 Claimant’s contract provided as follows:
5. SUB-SURFACE EXPLORATION
Sub-surface explorations have been made within the limits of the proposed work. Interested parties may review the records of these explorations at the office of the District Engineer in Buffalo, New York.
The information contained in the foregoing paragraph is offered in good faith by the Department and reflects the opinions of the Department engineers relative to the sub-surface conditions. The Contractor’s attention, however, is called to the fact that the information obtained therefrom is not to be substituted for personal investigation and research by the Contractor as required by Article three of the Contract Agreement.
6. EXCAVATION
Overhaul will not be paid for under this contract. The cost of overhaul as such shall be included in the price bid for the various excavation items. All suitable material removed from the road excavation and drainage ditches shall be used in the roadway embankments or otherwise, as directed by the Engineer.
The quantity of excavation is sufficient to include those quantities required for embankment, foundation course, shoulders and trench backfill. All material for embankment, foundation, shoulders and trench will be paid for under Item 2B. No payment will be made under Items 39ÍBYS, 2590'S, 259LS or 119S for acceptable material which is taken from the excavation thru the gravel deposit between Sta. 972+00 and 1010+00.
Materials excavated and found by the Engineer to be unsuitable for use in the roadway embankments shall be wasted along toe of fills or otherwise, as directed by the Engineer.
7. FOUNDATION COURSE, SHOULDERS, TRENCH BACKFILL
The Contractor’s attention is called to Items 39ERYS, 259GS, 259LS and 119S under which no payment is made for material (gravel). It is the intent that the material found between Sta. 972+00 and 1010+00 be used in these items and paid for under Item 2B (Unclassified Excavation). Payment under these items is for placing the material only, the cost of haul on these items would be included under 2B. The remaining surplus of excavated material of 41,022 C. Y. is felt to be ample to balance the quantity which was removed from this area after the cross sections were taken. However, should the quantity of acceptable material required exceed that which is available, necessitating using an off the job source, the Contractor would be paid for any additional foundation course material under Item 39BY.
Further attention is called to the typical section between Sta. 972+00 and 1010+00 which requires a 6" minimum foundation course in place of the 12" minimum foundation course which is used throughout the remainder of the project.
Representatives of the subcontractor visited the site of the project prior to bidding. Claimant has not satisfied us that their investigation thereof was conducted with reasonable care. Had it been they would, we believe, have observed certain conditions which, according to witnesses whose testimony preponderates, disclosed that the job site between Stations 972 and 1002, colloquially known as the “ big cut”, were readily to be seen. *997 There was sand on the bottom of the face, gravel and sand mixture in the middle of the face and gravel on top of the open face. These conditions were observed by others; not only by the engineer in charge for the State Thruway Authority, but by some of claimant’s own employees and by an entirely disinterested witness, an employee of the Clarence Sand and Gravel Company, who had, prior to Thruway construction, operated machinery in the gravel pit.
The contract called for the excavation of estimated quantities of earth from certain areas on the project site and the placing of earth in fill areas thereon. Details were set forth in earthwork sheets depicted on Sheet 8 of the contract plans. There a table of balances recited the quantities estimated to be excavated from certain locations which were designated by contract station numbers. The table gave the yardage which, it was estimated, would be obtained between Station 972 and Station 1010 as 393,628 cubic yards. This was denominated Balance 7. Combining all the cut and fill estimates, an estimated surplus of 220,672 cubic yards of material was indicated. The estimated yardage of select material available from Balance 7 was 179,650 cubic yards. Deducting that figure from the estimated surplus reduced that estimate to 41,022 cubic yards.
The “ big cut ” was in the path of the Thruway. Altogether claimant took from it 410,624 cubic yards of material. This figure included 25,000 cubic yards which was not moved until after April 15, 1954. In 1953 claimant set aside from the material so excavated and stockpiled 19,246 cubic yards. This yardage was later used to meet gravel requirements for foundation course specified in the contract and designated as Item 39BYS.
Claimant contends that in the Spring of 1953 it discovered a vein of sand underlying the area upon which both lanes of the Thruway would be built between the stations comprising Balance 7. The vein varied in depth, but at spots measured 12 feet. This underlying sand met the contract specifications for embankment, Item 2B, but was unsuitable for the several gravel items. (See quotations from contract hereinabove.) Claimant then proposed to excavate the face of the cut which sloped upwards for 20 feet on a 45-degree angle and further proposed to use both sand and gravel for Item 2B and the gravel items indiscriminately as it came from the cut. Permission was refused by the defendant’s engineer and claimant was directed to procure gravel from the cut which would meet the contract specifications. To do this claimant was obliged to operate its equipment in a manner which increased its cost.
*998 It is claimant’s contention that when its representatives inspected the site the sand vein was not visible and thus its presence was unknown to claimant. However, as we have already stated, we find the preponderance of the evidence to be that the sand stratum was exposed to view. Therefore the claimant should have been aware of the situation.
Claimant further contends that it was misled by the earthwork sheets, in particular that the entire 393,628 cubic yards of material estimated to be available in Balance 7 met the contract specifications for the gravel items. However, reading the earthwork sheets together with the special notes in the proposal hereinabove quoted, particularly the last sentence of paragraph 7 which read “ should the quantity of acceptable material required exceed that which is available necessitating using an off the job source the contractor would be paid for any additional foundation course under Item 39RY ”, we reach the conclusion that there was no representation that all of the material to be found in the “ big cut ” would meet the gravel specifications. Accordingly we find and hold that claimant has failed to establish a cause of action on this item of its claim.
During the late Summer of 1953 it became apparent that borrow for embankment fill would be needed. On September 9 claimant applied to defendant’s engineer in charge of the contract for permission to obtain borrow from outside sources. On September 17 the engineer granted verbal permission to the contractor for such borrow but stated that it was at the contractor’s risk. Verbal permission was confirmed in writing by letter dated September 24. Thereafter claimant placed 67,259 cubic yards of borrow material in the embankment under Item 2B of the project.
We have already referred to the stockpiling of 19,246 cubic yards of material removed from Balance 7. This operation was performed without direction from the defendant’s engineer. Claimant contends that it was a necessary procedure in order to get at the sand which was then used to make embankment. The defendant’s engineer denies the necessity and avers that studies he made with the aid of his superiors indicated that in September, 1953 there was already in place sufficient extent of embankment ready for foundation course; that fill was available for further embankment and that the gravel could have been utilized without stockpiling. Moreover this witness asserted that only 6,000 cubic yards of sand were removed and then this yardage was not used by the contractor until several weeks later. In addition this engineer’s job diary indicates that excavation was in progress in Balance 16 from which it was estimated an excess *999 of 64,000 cubic yards for Item 2B could be obtained. Claimant seeks to recover damages for rehandling the 19,246 cubic yards it stockpiled at the contract unit price of $.74 per cubic yard. We find that claimant has failed to establish a cause of action on this item.
Another item which claimant seeks to recover is the sum of $28,107.50 for the increased cost of excavating, loading and hauling 25,000 cubic yards of material from Balance 7 and for flattening the slopes in that section of the Thruway. Claimant asserts that it sought permission to cut back the slopes in the “big cut” area at the time that excavation was being performed there but that permission was then refused and that later on, in April, 1954, and after excavation had been completed and ditches had been constructed, it was directed to return to the area to procure more gravel needed for the completion of Items 259LS and 259GS.
Actually only the slopes on the south side of the project and beyond the ditch line are involved in the dispute over this item because the slope to the north of the Thruway lanes had been cut back in 1953. It is true that in 1954 there was a need for gravel not only for Items 259LS and 259GS but also for foundation course Item 39B.YS to be placed upon embankment then being built. When claimant sought a source of supply for the gravel requirement the defendant’s engineer obtained authority to give permission to take it out of the location south of the ditch line in the area of Balance 7. Thereupon claimant proceeded to use that area as its source of supply for the items above mentioned, as the need therefor arose. The evidence does not sustain claimant’s contention that it was refused permission to cut back the slopes in 1953 or at any other time or that the orderly progress of its work was interfered with by the defendant’s agents. Furthermore, claimant has not given satisfactory explanation as to where it would have placed the gravel had it cut back the slopes and extracted the material in the Fall of 1953. This item is disallowed.
There are two items of the claim on which we find claimant has established causes of action and is entitled to recover the damages sustained. It was directed by the defendant’s engineer to stockpile 3,000 cubic yards of topsoil to conserve it for use when needed. This required claimant to handle that quantity of topsoil a second time. Pursuant to the contract, claimant is entitled to recover the unit price of $.74 per cubic yard under Item 2B, a total of $2,220.
Although the general specifications, page 183, required the contractor to provide spoil banks for the disposal of unsuitable *1000 material .at its own expense, this requirement was superseded by the provision which appears as the third paragraph of special note 6 first hereinabove quoted. The special note is silent with respect to the acquisition of dumps for spoil by the contractor at its own expense. Nevertheless, claimant was directed and required to provide a suitable area for the wasting of materials on private property. This cost claimant $1,663.75 which, we find, claimant is entitled to recover.
Claimant is also entitled to interest upon the sum of $264,150.86 recovered by it pursuant to an order of severance and a consequent judgment of this court entered September 19,1955 which was satisfied by the State Comptroller -on October 5, 1955. Interest has been computed by the Clerk and certified to be $6,486.37.
Upon the foregoing claimant is entitled to recover herein against the New York State Thruway Authority as follows: Rehandling topsoil, $2,220; acquiring spoil bank, $1,663.75, a total of $3,883.75, together with interest thereon from February 24,1955 to the date of entry of judgment.
Claimant is also entitled to recover herein against the New York State Thruway Authority the sum of $6,486.37, together with interest thereon from October 5, 1955 to the date of entry of judgment.